STATE OF CONNECTICUT *v.* HERIBERTO HERNANDEZ
(12526)

PETERS, C. J., SHEA, CALLAHAN, BORDEN and FORD, Js.

Argued April 1—decision released July 14, 1987

*Robert F. McWeeny,* with whom, on the brief, was *Helen Apostolidis,* for the appellant (defendant).

*Julia DiCocco Dewey,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* assistant state's attorney, and *Alok Ahuja,* legal intern, for the appellee (state).

CALLAHAN, J. The defendant was arrested on January 6, 1983, and charged with the crimes of felony murder in violation of General Statutes § 53a-54c, arson in the first degree in violation of General Statutes § 53a-111 (a) (1), and burglary in the first degree in violation of General Statutes § 53a-102 (a). Following a trial to a jury, he was found guilty on all counts and was subsequently sentenced to a total effective sentence of sixty years imprisonment. The defendant then took this appeal.

The jury could reasonably have found the following facts: On January 1, 1983, at approximately 5:50 a.m., a fire was reported in progress at an apartment located in a building at 40 Cedar Street, Meriden. Firefighters arrived at the scene shortly thereafter and, upon entering the apartment, found thick, black smoke primarily concentrated in the rear of the apartment. While attempting to extinguish the fire, they heard a female calling for help. In the bedroom of the apartment they discovered an elderly woman who had been tied at her wrists and feet with electrical appliance cords. While the woman was telling the firefighters that she had

been attacked by an intruder, they noticed that she had what appeared to be a knife wound on her side, and an injury to her head. During an investigation of the scene, a hammer was found near the apartment in the hallway, knives were found on the bedroom floor, and the walls of the apartment were observed to be stained with blood.

The victim was admitted to Meriden-Wallingford Hospital at approximately 6:30 a.m., and was pronounced dead shortly thereafter. An examination at the hospital revealed that she had three major wounds, one resulting from a blow to the head, and two stab wounds to her body. Although she had suffered from smoke inhalation, the three wounds caused her death. On January 6, 1983, while the defendant was being held in lieu of bond on an unrelated charge, the Meriden police department interviewed him concerning the present case. The interview resulted in two inculpatory statements by the defendant, and, as a result, he was arrested for the charges involved in this appeal. Other facts will be discussed as they become relevant to the defendant's claims of error.

On appeal, the defendant claims that the trial court erred in: (1) restricting the voir dire examination of the prospective jurors; (2) denying the defendant's motion to dismiss the felony murder count on the ground that General Statutes § 53a-54c, the felony murder statute, is unconstitutional; (3) excluding from evidence the confession of a third party; and (4) admitting into evidence the defendant's confession.

We find no reversible error.

I

The defendant first claims that the trial court erred in restricting the scope of voir dire examination by refusing to permit defense counsel the opportunity to

inquire of prospective jurors: (1) whether they would be able to exclude feelings of sympathy toward either the prosecution or the defense; and (2) whether they would be inclined to attach greater weight to the testimony of law enforcement officers solely because of their status. He claims that those restrictions constitute reversible error since they violated his statutory and constitutional right to conduct a voir dire examination of prospective jurors. We disagree.

During the voir dire of the first venireperson, defense counsel asked: "Do you think you'll be able to follow the judge's instructions that police officers deserve no more—." The trial court interrupted the question and informed defense counsel that the question was not allowed. Defense counsel took an exception to the court's ruling and requested permission to argue his reasons for such an inquiry. The trial court denied the request for an argument, and defense counsel duly excepted. Prior to the examination of the next prospective juror, defense counsel again sought the trial court's permission to explain on the record his reasons for inquiring with respect to the testimony of police officers, and again the trial judge denied the request. Defense counsel then asked the next prospective juror: "Now, from what the judge said do you understand and are you able to follow his instructions that sympathy in favor of Mr. Hernandez or his father who is here or this woman or for her son or her family has no place in this case . . . based on evidence you hear in court?" The trial court held this to be an improper question, and an exception was taken by defense counsel. A similar question was asked of the next prospective juror, and the court disallowed it as well. Thereafter, the judge instructed both counsel in chambers that he would not allow inquiries on voir dire as to sympathy or credibility of police officers. Defense counsel then requested and obtained a continuing objection and exception to the court's ruling.

We recently reiterated the twofold purpose of voir dire: "to permit the trial court to determine whether a prospective juror is qualified to serve, and to aid the parties in exercising their right to peremptory challenges." *State* v. *Fritz,* 204 Conn. 156, 161, 527 A.2d 1157 (1987); *State* v. *Dolphin,* 203 Conn. 506, 512, 525 A.2d 509 (1987); *State* v. *Rogers,* 197 Conn. 314, 318, 497 A.2d 387 (1985); *State* v. *Haskins,* 188 Conn. 432, 446, 450 A.2d 828 (1982). The statutory right to a voir dire examination of each prospective juror in a criminal action is provided for in General Statutes § 54-82f.[1] In 1972, this right was established as a constitutional one by inclusion in article fourth of the amendments to the state constitution, which provides that " '[t]he right to question each juror individually by counsel shall be inviolate.' " *State* v. *Dahlgren,* 200 Conn. 586, 600, 512 A.2d 906 (1986).

"Because of the wide range of cases submitted to juries and the impossibility of establishing a set pattern of questions appropriate for the voir dire examination of prospective jurors, the trial court is vested with broad discretion in determining the scope of counsel's inquiry." *State* v. *Dolphin,* supra, 511–12. The exercise of such discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted. *State* v. *Fritz,* supra; *State* v. *Dolphin,* supra; *State* v. *Rogers,* supra,

[1] "[General Statutes] Sec. 54-82f. VOIR DIRE EXAMINATION. In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

317; *State* v. *Hill,* 196 Conn. 667, 671, 495 A.2d 699 (1985); *State* v. *Smith,* 10 Conn. App. 624, 639, 525 A.2d 116 (1987).

The defendant first claims that he should have been permitted to ask potential jurors whether they would be able to exclude feelings of sympathy toward either the prosecution or defense. The defendant mentioned this claim of error in his brief but has failed to formulate any reasoned legal argument with respect to how the trial judge's restriction affected his right to a meaningful voir dire. In light of this briefing failure, coupled with the lack of any citation to legal authority for his claim, we decline to undertake appellate review of this claim. See *State* v. *Ramsundar,* 204 Conn. 4, 16, 526 A.2d 1311 (1987); *Hayes* v. *Smith,* 194 Conn. 52, 66 n.12, 480 A.2d 425 (1984); *Cheney* v. *Strasburg,* 168 Conn. 135, 142, 357 A.2d 905 (1975); *State* v. *Smith,* supra, 635.

We do find error, however, in the trial court's refusal to permit defense counsel to inquire as to whether a juror would attach greater credence to the testimony of a police officer simply because of his official status. We recently held that " '[w]hen important testimony is *anticipated* from certain witnesses whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination should be permitted. It was of vital importance to the defendant that if any such inclination existed it be brought to light. [A defendant is] entitled to explore this area of possible disqualification prior to the impaneling of the jury. . . . *State* v. *Higgs,* [143 Conn. 138, 144, 120 A.2d 152 (1956)].' " (Emphasis in original.) *State* v. *Fritz,* supra, 163, quoting *State* v. *Hill,* supra, 672–73.

This conclusion of error, however, does not end our inquiry. We must determine whether the error is revers-

ible, which requires a conclusion that harmful prejudice resulted to the defendant. *State* v. *Fritz,* supra, 162; *State* v. *Dolphin,* supra; *State* v. *Rogers,* supra; *State* v. *Smith,* supra. In those cases in which we have considered the issue presented in this appeal, we have found harmful prejudice where the testimony of the police officer or official has been crucial to the state's case. See *State* v. *Fritz,* supra, 165–66; *State* v. *Dolphin,* supra, 516; *State* v. *Rogers,* supra, 318; *State* v. *Hill,* supra, 672. In *State* v. *Fritz,* supra, where the defendant was charged with illegally prescribing controlled substances in violation of General Statutes §§ 19-460 and 19-480a (now General Statutes §§ 21a-252 [a] and 21a-278), the testimony of police officers and state medical officials was crucial to the state's case because, if believed by the jury, it tended to support an inference of guilt under the applicable statutory provisions. In *State* v. *Dolphin,* supra, 514–15, where the defendant was charged with robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), a police officer's testimony was crucial in establishing that the defendant was armed with a deadly weapon, a necessary element in proving the state's case. See also *State* v. *Rogers,* supra, 318–19 (police testimony crucial to the state's attempt to disprove the defendant's alibi defense); *State* v. *Hill,* supra, 672 (police testimony tended to corroborate the testimony of the sole eyewitness, a witness whose credibility was highly questionable in light of conflicting statements made prior to trial).

In this case, the defendant argues that the testimony of police officers was crucial because, other than the testimony of a lay witness whose credibility was questionable, it was the only evidence which connected the defendant with the crimes with which he was charged. We are unpersuaded. While the testimony of fire officials and police officers was important to the state's

case with respect to the circumstances surrounding the incident in question and as to the results of their respective investigations, a review of the record indicates that the defendant was linked to the crime by his own detailed, written confession, and by the testimony of a third party lay witness. Although the defendant recanted his confession, he did not deny having given it. Nor does he contest the accuracy of the police officer's testimony at trial with respect to the content of his confession.[2] Unlike those cases discussed previously, the credibility of the police officers and fire officials in this case was never called into question during the course of the trial. We hold, therefore, that the testimony of police officers and fire officials in this case was not crucial. While the trial court should have allowed

---

[2] The defendant would have us believe that the police officers' testimony at trial was crucial with respect to the voluntariness of his confession. We disagree. This issue was determined by the trial court as a matter of law at a motion to suppress hearing outside the presence of the jury. See part IV of this opinion. At trial, the state called Sergeant Joseph Fritz, who testified concerning, inter alia, the reading of the rights form to the defendant. He also read into the record the two statements the defendant had given to the police, one of which inculpated a third party, and the second of which detailed his own commission of the crimes. On cross-examination, defense counsel questioned Fritz concerning the crime scene, the details of the two statements given by the defendant, and as to whether the officers had given the defendant any of the factual circumstances of the crime prior to interviewing him. Inspector Lester Redican was then called by the state as a rebuttal witness to bolster the testimony of Fritz that no details of the homicide were given to the defendant before he gave his signed confession. Sergeant Greg Kosienski testified only at the motion to suppress hearing.

In addition, the trial court instructed the jury that the voluntariness of the confession was a question of law that the court had decided prior to trial, and that the weight to be accorded to the defendant's confession was for the jurors to decide by considering all the factors before them, including the physical and mental condition of the alleged confessor. Under these circumstances, we conclude, therefore, that although the police officers' testimony was significant in determining whether the defendant's confession was admissible, their testimony in the presence of the jury at trial was not so crucial as to warrant a finding of harmful prejudice from the trial court's erroneous restriction of the voir dire.

defense counsel to inquire into potential jurors' views concerning the testimony of police officers, the failure to do so, under the factual circumstances of this case, did not result in harmful prejudice.

## II

The defendant next claims that the felony murder statute, General Statutes § 53a-54c,[3] violates his rights under the eighth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. "A party contesting a statute's constitutionality has a heavy burden to prove unconstitutionality beyond a reasonable doubt." *State* v. *Dupree*, 196 Conn. 655, 663, 495 A.2d 691 (1985), cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985); *Kellems* v. *Brown*, 163 Conn. 478, 486, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973). We conclude that the defendant has failed to sustain this burden.

The defendant argues that the statute mandates a conclusive presumption of intent to cause death, or it establishes a distinct form of homicide without a mens

---

[3] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or a flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

rea element other than intent to commit the underlying felony. It is clear that "[a] statute which creates a presumption and shifts to the defendant the burden to disprove an element of the crime charged would be a violation of both the federal and state due process clauses. Due process requires that the state prove all the elements of the crime charged beyond a reasonable doubt. *Sandstrom* v. *Montana,* 442 U.S. 510, 520–24, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979); *In re Winship,* 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Little,* 194 Conn. 665, 671, 485 A.2d 913 (1984); *State* v. *Scielzo,* 190 Conn. 191, 196, 460 A.2d 951 (1983)." *State* v. *Dupree,* supra.

In *State* v. *Dupree,* supra, the defendant raised a similar constitutional challenge to the arson murder statute, General Statutes § 53a-54d. There, the defendant claimed that the statute, merely from proof of the underlying crime of arson, creates an irrebuttable presumption of intent to cause death, and that such intent is an element of the crime of arson murder. In rejecting the defendant's claim, we reasoned that "[i]ntent to cause death is not an element of the crime of arson murder. Arson murder has no mens rea requirement beyond that of an intention to commit the underlying crime of arson upon which the charge of arson murder is predicated." Id.; see also *State* v. *Valeriano,* 191 Conn. 659, 662, 468 A.2d 936 (1983), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984); *State* v. *Young,* 191 Conn. 636, 639–44, 469 A.2d 1189 (1983).

Similarly, as the defendant acknowledges, intent to cause death is not an element of the crime of felony murder. See *State* v. *Castro,* 196 Conn. 421, 429, 493 A.2d 223 (1985).[4] "In order to obtain a conviction for

---

[4] We do not agree with the defendant's related argument that intent is an "implied element" of the crime of felony murder. All that is required is an intent to commit the underlying crime upon which the felony murder charge is based. See *State* v. *Dupree,* 196 Conn. 655, 663, 495 A.2d 691,

felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, that a death was caused in the course of and in furtherance of that felony. General Statutes § 54a-54c." Id., 428–29. Since the statute does not shift the burden of proof as to an element of the crime, the trial court did not err in finding that § 53a-54c does not violate the defendant's constitutional rights.

The defendant further claims that § 53a-54c violates the eighth and fourteenth amendments by imposing disproportionately severe penalties for conviction of a crime without a mens rea element. Specifically, he argues that conviction under § 53a-54c carries severe punishment despite the fact that the trier of fact is not required to find culpability that would justify the sanction. In addition, he argues that the statute cannot be justified as a deterrent to the commission of underlying felonies. We disagree.

Initially, we note that the classification of crimes is for the legislature. *State* v. *Dupree,* supra, 665; *State* v. *Rao,* 171 Conn. 600, 603, 370 A.2d 1310 (1976). "Legislative prerogative, however, is not open-ended. The United States Supreme Court has held that while reviewing courts should grant substantial deference to the broad authority that legislatures possess in determining the types and limits of punishment for crimes, a criminal sentence must be proportionate to the crime for which the defendant has been convicted. *Solem* v. *Helm,* 463 U.S. 277, 288–90, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). The [United States] Supreme Court noted in *Solem* v. *Helm,* supra, however, that 'outside the context of capital punishment, successful challenges

cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985); *State* v. *Valeriano,* 191 Conn. 659, 662, 468 A.2d 936 (1983), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984); *State* v. *Young,* 191 Conn. 636, 639–44, 469 A.2d 1189 (1983).

to the proportionality of particular sentences [will be] exceedingly rare.' Id." *State* v. *Dupree,* supra, 655–56.[5]

The defendant relies heavily on the United States Supreme Court decision in *Enmund* v. *Florida,* 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), to support his argument that the penalty for felony murder is cruel and unusual punishment. There, the United States Supreme Court reversed the *death sentence* of a defendant convicted under Florida's felony murder statute because the defendant did not intend to take a life, attempt to take a life, or intend that a life be taken or lethal force be used. Id.; cf. *Coker* v. *Georgia,* 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977) (sentence of death is grossly disproportionate to and excessive punishment for the crime of rape). We conclude, however, that the circumstances and reasoning of *Enmund* are inapposite to this case. *Enmund,* a capital case, was limited to its factual circumstances.[6] The degree of the defendant's participation in the murders was found to be so tangential that it could not be said to justify a sentence of death. *Enmund* v. *Florida,* supra. The defendant in this case was not sentenced to death, but to a total effective sentence of sixty years. We do not find that his sentence was grossly disproportionate to the nature of the offense involved in this case. See *State* v. *Dupree,* supra, 666.

---

[5] The factors that reviewing courts may take into account in determining proportionality are set forth in *Solem* v. *Helm,* 463 U.S. 277, 292, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983): (1) the gravity of the offense and the harshness of the penalty; (2) a comparison of sentences imposed on other criminals in the same jurisdiction; and (3) a comparison of sentences imposed for commission of the same crime in other jurisdictions.

[6] The defendant in *Enmund* was the driver of the "getaway" car in an armed robbery of a dwelling. The occupants of the house, an elderly couple, resisted and Enmund's accomplices killed them. The court held that the death penalty was disproportionate to the crime of felony murder "under these circumstances." *Enmund* v. *Florida,* 458 U.S. 782, 788, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982).

## III

The defendant next claims that the trial court erred in excluding the hearsay confession of a third party. The defendant attempted to introduce a statement made by an unknown third party. The statement was sought to be introduced through Ramon Torres, a tenant who lived on the first floor of the victim's building.

In the absence of the jury, Torres testified that sometime after midnight on December 31, 1982, he had just gone to bed when he heard a car hit a light post on Cedar Street. He stated that he had gone to the window and had seen a man exit a car, an old Chrysler, and then approach and enter his building. He described the man to be "sort of colored," about five feet three inches tall and weighing 200 pounds, a description which did not fit the defendant. He further testified that he had seen the same man leave the building approximately fifteen minutes later. He stated that thereafter a fire truck had arrived at the building.

Torres further testified that on January 2, 1983, he had left his apartment to visit with friends. Upon returning, he found that his apartment had been ransacked. He testified that at about the same time he had seen a man outside his apartment, possibly the same man he had seen on New Year's Eve, and that this man told him that he had killed somebody and that he could kill somebody else. Defense counsel argued that, although this statement constituted hearsay, it should be admitted as a declaration against penal interest, an exception to the hearsay rule. The trial court refused to admit the statement.

It is now clear in Connecticut "that third party statements against penal interest exculpatory to the defendant are no longer per se inadmissible." *State* v. *Sanchez,* 200 Conn. 721, 724, 513 A.2d 653 (1986); *State* v.

*DeFreitas,* 179 Conn. 431, 448, 426 A.2d 799 (1980); see also *State* v. *Frye,* 182 Conn. 476, 479, 438 A.2d 735 (1980); *State* v. *Gold,* 180 Conn. 619, 630–31, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). In *State* v. *DeFreitas,* supra, 448–52, we adopted a rule consistent with the United States Supreme Court decision in *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), and in accord with rule 804 (b) (3) of the Federal Rules of Evidence providing that trustworthy third party statements against penal interest exculpatory to a defendant are admissible if the declarant is unavailable. *State* v. *Sanchez,* supra, 724–25.

"Our rule requires, as does the federal rule, that the trustworthiness of such proffered statements be examined carefully. [*State* v. *Gold,* supra,] 630. Rule 804 (b) (3) of the Federal Rules of Evidence 'requires that "corroborating circumstances clearly indicate the trustworthiness of the statement" before the statement is admissible to exculpate the accused.' *State* v. *Gold,* supra, 630–31. In determining whether 'the threshold level of trustworthiness [is] satisfied'; id., 630; the trial court does not have to find it to be 'absolutely trustworthy' because if this were so, 'the province of the jury as the finder of fact and weigher of credibility would be entirely invaded.' Id., 632." *State* v. *Bryant,* 202 Conn. 676, 693, 513 A.2d 66 (1987).

At the outset, we note that "[t]he determination whether a third party declaration against penal interest is trustworthy lies in the sound discretion of the trial court. *State* v. *DeFreitas,* supra [452]." Id. Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. See *State* v. *Martin,* 170 Conn. 161, 166, 365 A.2d 104 (1976). In ruling upon the admission of the testimony concerning the third party statement in this case, the

trial court first discussed the credibility of the in-court witness, Ramon Torres, as being very questionable, and then assessed the third party statement itself, stating that the evidence did not establish corroborating circumstances that would indicate the trustworthiness of the statement. The trial court excluded all of Ramon Torres' testimony. The defendant claims that the third party statement to Torres met the threshold of trustworthiness, and that the trial court improperly considered the credibility of the in-court witness, Torres, in excluding his testimony. While we agree with the defendant that the trial court improperly determined that it must evaluate the credibility of the in-court witness; see *United States* v. *Katsougrakis,* 715 F.2d 769, 777 (2d Cir. 1983), cert. denied, 464 U.S. 1040, 104 S. Ct. 704, 79 L. Ed. 2d 169 (1984);[7] we conclude that this error was harmless in view of the fact that the trial judge also made a determination with respect to the trustworthiness of the third party statement itself. For reasons we will now discuss, we find that the third party statement was properly excluded as being untrustworthy.

Four general considerations are relevant to an investigation of the trustworthiness of a third party confession: " '(1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's

---

[7] The Second Circuit Court of Appeals in *United States* v. *Katsougrakis,* 715 F.2d 769, 777 (2d Cir. 1983), rejected the position that the credibility of the in-court witness must be evaluated *before* the jury is permitted to hear testimony that inculpates both the out-of-court declarant and the accused. The court reasoned that "the in-court witness takes the stand and is subject to cross-examination. The jury is able to observe firsthand the witness's demeanor and response to questions; it may assess without obstacle the credibility of the witness. Indeed, to require a preliminary assessment of the in-court witness's credibility would . . . be a usurpation of the jury function." Id.

penal interest; [and] (4) the availability of the declarant as a witness.' " *State* v. *Frye,* supra, 479. "No single factor in the test for determining trustworthiness is necessarily conclusive; *State* v. *Gold,* supra, 633–34; the factors are reflective of the fact that there can be ' "no precise formulation of the proof which would constitute sufficient evidence of the trustworthiness" ' of such declarations. *State* v. *Frye,* supra, 480." *State* v. *Sanchez,* supra, 725; see also *State* v. *Bryant,* supra, 693. In this case, the unavailability of the declarant was established, and it cannot be disputed that the alleged statement was against the declarant's penal interest.[8] Therefore, we only address the evidence concerning the time of the declaration and the party to whom it was made, and the evidence corroborating the statement. See *State* v. *DeFreitas,* supra, 449.

Although the statement was allegedly made the day after the crimes occurred; see *State* v. *Bryant,* supra, 698; *State* v. *Sanchez,* supra; *State* v. *Gold,* supra, 634; cf. *United States* v. *Satterfield,* 572 F.2d 687 (9th Cir.), cert. denied, 439 U.S. 840, 99 S. Ct. 128, 58 L. Ed. 2d 138 (1978) (confession made two years after crime); the record does not support the claim that it was made to a person under circumstances indicating that it was trustworthy. We have indicated in previous cases that the witness testifying as to the statement must be one in whom the declarant would naturally confide. *State* v. *Bryant,* supra, 699; *State* v. *Sanchez,* supra, 726; cf.

---

[8] The state argues in its brief that the statement was not against the declarant's penal interest because his identity was unknown to the person receiving the confession. Further, it argues that the declarant did not specifically name his victim, and that it was unclear whether he specified the sex of the victim. It claims that such a vague confession, made to a total stranger, could not be against the declarant's penal interest. We disagree. The considerations the state advances are relevant not to whether the statement is against the declarant's penal interest, but to whether the statement should be deemed trustworthy. See *State* v. *Sanchez,* 200 Conn. 721, 726, 513 A.2d 653 (1986); *State* v. *DeFreitas,* 179 Conn. 431, 453, 426 A.2d 799 (1980).

*State* v. *Lowery,* 401 F. Sup. 604 (D. Md. 1975); aff'd without opinion, 532 F.2d 750 (4th Cir.), cert. denied, 429 U.S. 919, 97 S. Ct. 312, 50 L. Ed. 2d 285 (1976) (affidavit sworn to before prison official). Here, Torres testified that he did not know the declarant. We conclude, therefore, that there was no "close, confidential relationship between the declarant and the witness that would indicate the trustworthiness of the alleged [third party] declaration . . . . " *State* v. *Sanchez,* supra.

Finally, a review of the record indicates that the evidence corroborating the statement is scant at best. Cf. *State* v. *Gold,* supra ("myriad of corroborating circumstances" were present to indicate reliability). The declarant told Torres that he had killed someone in the building and that he might kill someone else. He did not include any details concerning the killing, or mention anything concerning a fire in the building. Nor did Torres definitely identify the declarant as the man who entered and then left the building near the time of the crime.

Unlike the situation in *State* v. *Gold,* supra, 634–35, the declarant was not placed in the vicinity of the crime by another witness. Thus, there was no independent evidence that the declarant had an opportunity to commit the murder. *State* v. *Sanchez,* supra; cf. *State* v. *Guillette,* 547 F.2d 743, 754 (2d Cir. 1976), cert. denied, 434 U.S. 839, 98 S. Ct. 132, 54 L. Ed. 2d 102 (1977). Moreover, there were discrepancies between Torres' statement to the police concerning the appearance of the declarant and his testimony in court. In the police report he identified the man in the hallway as being five feet nine inches tall and weighing 170 pounds, and his in-court testimony described the man as being five feet three inches tall and 200 pounds. See *State* v. *Sanchez,* supra, 727. We conclude that the trial court did not abuse its discretion when it excluded Torres' tes-

timony concerning the unknown declarant's statement in the absence of any corroborating circumstances to indicate that it was trustworthy.

## IV

Finally, the defendant claims that the trial court erred in denying his motion to suppress because his confession was made without a voluntary, knowing and intelligent waiver of his right against self-incrimination.[9] We disagree.

The facts leading up to the defendant's confession are undisputed. As mentioned previously, on January 6, 1984, the defendant was transferred from the New Haven correctional center, where he was being held in lieu of bond on an unrelated charge, to the Meriden police department. There the defendant was interviewed by Sergeant Greg Kosienski, Detective Joseph Fritz, and Lester Redican, an inspector with the New Haven state's attorney's office. Prior to the interview, the defendant was advised of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), in English from a "rights card," which the defendant stated he understood. He then signed a standard waiver form. Kosienski informed the defendant that the police were investigating a homicide that had taken place in the apartment building at 40 Cedar Street. The defendant responded that he wished to "help out." Initially, he made a statement to the effect that an unknown black male had forced him to assist in the burglary and arson at Cedar Street. The defendant then changed his story, and in a signed confession admitted that he alone had confronted and stabbed the victim. He gave a detailed description of

[9] The defendant did not brief the basis of his state constitutional argument; therefore we consider it abandoned. *Czarnecki* v. *Plastics Liquidating Co.*, 179 Conn. 261, 262 n.1, 425 A.2d 1289 (1979); *Sachem's Head Assn.* v. *Lufkin*, 168 Conn. 365, 366, 362 A.2d 519 (1975).

the homicide, telling the police officers that he had entered the victim's apartment through an open second floor window. He stated that when the victim confronted him, he tied her to her bed with an electric appliance cord, struck her with a hammer, and then stabbed her twice with a knife. He further stated that he had then set the bed on fire and left the apartment. The defendant claims that these statements should have been declared inadmissible because he was intellectually incapable of intelligently and knowingly giving up his right against self-incrimination.

The state bears the burden of establishing, by a preponderance of the evidence, that the defendant's waiver of his *Miranda* rights was knowingly, intelligently, and voluntarily made. *State* v. *Chung,* 202 Conn. 39, 48, 519 A.2d 1175 (1987); *State* v. *Smith,* 200 Conn. 465, 481, 512 A.2d 189 (1986); *State* v. *Alfonso,* 195 Conn. 624, 628, 490 A.2d 75 (1985). " ' "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina* v. *Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *State* v. *Frazier,* 185 Conn. 211, 226, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982). "[T]he question of waiver must be determined on 'the particular facts or circumstance surrounding [the] case, including the background, experience, and conduct of the accused.' *Johnson* v. *Zerbst,* 304 U.S. 458, 464 [58 S. Ct. 1019, 82 L. Ed. 1461 (1938)]." *North Carolina* v. *Butler,* supra, 374–75 . . . .' " *State* v. *Chung,* supra, 48. " ' "Although the issue is therefore ultimately factual, our usual deference to the fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. . . . " *State* v. *Harris,* 188 Conn.

574, 579–80, 452 A.2d 634 (1982).' *State* v. *Pellegrino,* 194 Conn. 279, 288–89, 480 A.2d 537 (1984)." *State* v. *Smith,* supra, 481.

We stated in *State* v. *Toste,* 198 Conn. 573, 580–81, 504 A.2d 1036 (1986), that a determination of whether a defendant has "knowingly and intelligently" waived his rights under *Miranda* "depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. See *Tague* v. *Louisiana,* 444 U.S. 469, 469–70, 100 S. Ct. 652, 62 L. Ed. 2d 622 (1980); *Fare* v. *Michael C.,* 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197, reh. denied, 444 U.S. 887, 100 S. Ct. 186, 62 L. Ed. 2d 121 (1979); see generally LaFave & Israel, Criminal Procedure (1984) § 6.9 (b). Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings; *Fare* v. *Michael C.,* supra, 726; *State* v. *Alfonso,* supra, 630–31; *People* v. *Medina,* 71 Ill. 2d 254, 259, 375 N.E.2d 78 (1978); his level of intelligence, including his IQ; *Cooper* v. *Griffin,* 455 F.2d 1142, 1145 (5th Cir. 1972); *State* v. *Benoit,* 440 So. 2d 129, 131 (La. 1983); *Matter of Welfare of S.W.T.,* 277 N.W.2d 507, 512–13 (Minn. 1979); his age; *Fare* v. *Michael C.,* supra; *Matter of D.A.S.,* 391 A.2d 255, 258 (D.C. App. 1978); his level of education; *Davis* v. *North Carolina,* 384 U.S. 737, 742, 86 S. Ct. 1761, 16 L. Ed. 2d 895 (1966); *State* v. *Harris,* 188 Conn. 574, 581, 452 A.2d 634, cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1982); his vocabulary and ability to read and write in the language in which the warnings were given; see *State* v. *Alfonso,* supra; *State* v. *Frazier,* supra, 226; intoxication; see *State* v. *Stankowski,* 184 Conn. 121, 134–35, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); his emotional state; *State* v. *Harris,* supra,

582; and the existence of any mental disease, disorder or retardation. *Henry* v. *Dees,* 658 F.2d 406, 411 (5th Cir. 1981); *People* v. *Watson,* 75 Cal. App. 3d 384, 397, 142 Cal. Rptr. 134 (1977)." See also *State* v. *Chung,* supra, 49–50.

After a careful review of the record, in light of the above factors, we conclude that the state has met its burden of showing that the defendant had the capacity to understand the meaning of his rights as explained to him by the Meriden police. The defendant was an adult, was familiar with police procedures and had been arrested previously. *State* v. *Chung,* supra, 50 (and cases cited therein); *State* v. *Toste,* supra, 581. He communicated well orally with the police officers during his interrogation. Although the defendant is from an Hispanic background, he has lived in the United States all his life, and his primary language is English. There was testimony from a clinical psychologist that the defendant's overall IQ score placed him in the borderline mentally retarded range; this fact alone, however, does not compel a finding that he could not understand the meaning of his rights. *State* v. *Toste,* supra; see *People* v. *Watson,* supra, 396 (where confession from an accused with an IQ of 65 and signs of chronic brain damage and schizophrenia was admitted); *State* v. *Moss,* 7 Kan. App. 2d 215, 216–17, 640 P.2d 321 (1982) (63 IQ; eighth grade education); *Commonwealth* v. *White,* 362 Mass. 193, 196, 285 N.E.2d 110 (1972) (low IQ, illiterate); *State* v. *Adkins,* 289 S.E.2d 720, 728 (W. Va. 1982) (49 IQ, moderate retardation). The defendant has a ninth grade education and when asked whether he understood his rights, he responded affirmatively, signed an acknowledgment form, and told the officers it was unnecessary to read them again to him in Spanish. He also informed them that he had been read his rights on other occasions. In addition, during the interrogation the police officers engaged him in other con-

versation concerning his family and his neighborhood to determine whether he understood what they were talking about. The police officers testified that he had given loud and clear answers to all their questions. In addition, there was no evidence to indicate that the defendant was under the influence of either alcohol or drugs. *State* v. *Toste,* supra, 582. On the basis of the entire record, there simply is no evidence to show that the defendant did not understand his rights.

We also indicated in *State* v. *Toste,* supra, 582, that " '[w]aiver is not conclusively established by demonstrating that *Miranda* warnings were given and understood. *State* v. *Wilson,* [183 Conn. 280, 284, 439 A.2d 330 (1981)]; see *United States ex rel. Abubake* v. *Redman,* 521 F. Sup. 963, 975 (D. Del. 1981). . . .' *State* v. *Aversa,* [197 Conn. 685, 695, 501 A.2d 370 (1985)], quoting *State* v. *Harris,* supra, 579–80." In this case, however, the defendant expressly agreed to cooperate with the police. There is no evidence of undue persuasion on the part of the police *State* v. *Chung,* supra, 56–57; the interrogation took place over a five hour period, and was described as a "very relaxed, time consuming" discussion, and the defendant was offered both food and drink during this time period. He expressly agreed to the questioning, and then proceeded to sign a written version of those statements. *State* v. *Toste,* supra, 583. On the basis of these facts, we cannot conclude that the trial court erred in finding that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights.[10]

[10] The defendant raises another claim related to his confession. He contends that his removal from the New Haven Correctional Center, where he was being held on an unrelated robbery charge, to Meriden police headquarters constituted an unlawful seizure of his person. He argues, therefore, that his subsequent confession should have been suppressed. This claim is without merit. The defendant was lawfully in custody on the robbery charge and his transfer to Meriden for questioning did not effect a change in that status.